UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TRANSCONTINENTAL GAS PIPE LINE CORPORATION | * * * | CIVIL ACTION |
| VERSUS | * * | NO. 06-6316 c/w 08-4039 |
| TRANSOCEAN OFFSHORE USA INC., TRANSOCEAN INC. AND THE MODU TRANSOCEAN MARIANAS | * * * * | SECTION L "4" JUDGE FALLON MAGISTRATE JUDGE ROBY |

* * * * * * * * * * * * * * * * * * * * * * * * * *

<u>MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT FINDING TRANSOCEAN NEGLIGENT FOR FAILING TO NOTIFY AND/OR INVESTIGATE</u>

MAY IT PLEASE THE COURT:

Plaintiff, Transcontinental Gas Pipe Line Corporation ("Transco"), files this memorandum in support of its motion for partial summary judgment seeking an Order from this Honorable Court narrowing the issues for trial on the issue of the negligence of the defendant, Transocean Deepwater Drilling, Inc. ("Transocean") because Transocean (1) failed to notify the U.S. Coast Guard when its MODU TRANSOCEAN MARIANAS ("MARIANAS") broke free from its moorings, drifted unmanned 130 nautical miles and grounded, as required under applicable regulations, (2) failed to submit the required Form CG-2692 to the U.S. Coast Guard in connection with the serious marine incident involving the MARIANAS and (3) failed

1

unreasonably to conduct *any* investigation into whether the MARIANAS may have or actually did cause damage to any third party pipelines while it drifted and/or grounded in the Gulf of Mexico. Thus, Transco submits that pursuant to the undisputed facts, Transocean's conduct constitutes either negligence *per se* or alternatively simple negligence as a matter of law.[1]

## RELEVANT BACKGROUND FACTS

On or about September 23, 2005, during Hurricane Rita, Transocean's offshore drilling vessel, the MODU TRANSOCEAN MARIANAS, broke free of its moorings in Green Canyon Block 821 and was cast adrift in a northwesterly direction through the Gulf of Mexico, ultimately grounding approximately 130 nautical miles away in Eugene Island Block 113A where it was finally found by Transocean on September 25, 2005. The draft of the MARIANAS at this time was approximately 70 feet and the MARIANAS grounded in approximately 60 feet of water.[2]

Transco asked Transocean in written discovery to identify and produce any and all accident reports, injury reports or investigative reports drafted or submitted by Transocean concerning the drifting and grounding of the MARIANAS during Hurricane Rita.[3] Transocean

---

[1] Transco notes that the instant motion for *partial* summary judgment is intended to address only the issue of Transocean's negligence and it is not intended to affect Transco's burden of having to prove that this negligence on the part of Transocean caused at least some of Transco's damages as it was unable to discover the damage to its 20" pipeline before it ruptured six months later, flooding both that line and another of Transco's connected pipelines.

[2] Transocean submits that the MARIANAS' GPS system failed during Hurricane Rita and, thus, Transocean has produced no records establishing the exact location of the MARIANAS while adrift during this time period. Transocean's Rig Manager of the MARIANAS at the time, Kenneth Brown, testified that he was monitoring the GPS signal of the MARIANAS on his computer at home during Hurricane Rita and at some time the signal was lost, but he had no further information. (See Deposition of Kenneth Brown dated 2/25/2010, p. 77-78, attached hereto as Exhibit "A").

[3] *See* Transco's Request for Production No. 19 and Interrogatory No. 23 and Transocean's responses to same, all attached hereto as Exhibit "B."

responded to Transco's foregoing requests by stating that no such reports exist.[4] In fact, Transocean has produced 140,000 pages of documents in response to discovery in this case, but *it has never produced any documents* evidencing any investigation by Transocean into whether the MARIANAS may have damaged or impacted any third-party property, such as pipelines, while it drifted free through the Gulf of Mexico in waters shallower than its draft. Transocean has also never produced any documents evidencing any notice by Transocean to any pipeline companies with pipelines in the area where the MARIANAS drifted and grounded of any potential for damage.

Transocean, in response to Transco's discovery, identified its Rig Manager Ken Brown as having conducted Transocean's "investigation" regarding the runaway MARIANAS during Hurricane Rita.[5] However, when asked if Transocean conducted any investigation from the grounded location of the MARIANAS to track the drag scar and determine if any third parties could have been and/or actually were damaged, Mr. Brown testified as follows:

> **Q:** Did you ever have a discussion with anybody at Transocean about investigating not just where the rig was going to go, but where the rig had been before it grounded?
>
> **Mr. Brown:** Where it had been back to the location?
>
> **Q:** Right. Investigating the seafloor.
>
> **Mr. Brown:** I didn't have no—I wasn't involved with anything like that. What specifically are you talking about?
> …
> **Q:** Was there ever an investigation made to look at the bottom, the sea bottom, and see where the rig had come from and the path that it had taken to see if it possibly impacted other pipelines in the area?

---

[4] *See* Transco's Request for Production No. 19 and Interrogatory No. 23 and Transocean's responses to same, all attached hereto as Exhibit "B."
[5] *See* Transco's Interrogatory No. 21 and Transocean's response to same, attached hereto as Exhibit "C."

**Mr. Brown:** We didn't do that right there, no.

**Q:** Do you think that would have been a prudent thing to do?

**Mr. Brown:** I don't know. My concern was to get the rig out of there.[6]

Transocean also has never produced any documents evidencing any reporting to the U.S. Coast Guard. Specifically Transocean has never produced a Form 2692 submitted to the U.S. Coast Guard regarding the MARIANAS' drifting and ultimate grounding during Hurricane Rita, even though such report would also be responsive to written discovery by Transco in this case.[7] Further, in an effort to summarily establish that Transocean never reported the drifting and grounding of the MARIANAS to the U.S. Coast Guard and never submitted a Form 2692 in connection therewith, Transco sent a request to the U.S. Coast Guard pursuant to the Freedom of Information Act ("FOIA") asking for any and all records regarding the runaway MARIANAS during Hurricane Rita.[8] The U.S. Coast Guard responded to Transco's FOIA request, but such response did not include any Form 2692 or other documents evidencing any report by Transocean to the U.S. Coast Guard, notification to any potentially impacted third parties or investigation into possible damage to third parties.[9] Transocean's Rig Manager Ken Brown also testified that he never called the U.S. Coast Guard or submitted a Form 2692 in connection with the drifting and grounding of the MARIANAS.[10] It is thus undisputed that despite finding the MARIANAS hard aground 130 nautical miles from its original moored location in a water depth

---

[6] *See* Deposition of Kenneth Brown dated 2/25/2010, p. 87-88, attached hereto as Exhibit "A".
[7] *See* Transco's Request for Production No. 19 and Interrogatory No. 23 and Transocean's responses to same, all attached hereto as Exhibit "B."
[8] *See* FOIA request by Transco on 10/3/2007 to the U.S. Coast Guard, attached hereto as Exhibit "D."
[9] *See* U.S. Coast Guard FOIA response to Transco dated 11/5/2007, attached hereto as Exhibit "E."
[10] *See* Deposition of Kenneth Brown dated 2/25/2010, p. 89-92, attached hereto as Exhibit "A".

less than its draft, Transocean, more worried about its vessel, conducted no investigation to determine whether the vessel had damaged and/or impacted any third parties in its path and made no report or notification to either the U.S. Coast Guard or any potentially impacted third parties like pipeline companies in the area so that those entities could have conducted an investigation.

Transco filed the instant suit against Transocean alleging that while the MARIANAS was adrift, it crossed over and struck Transco's 20" pipeline in Eugene Island Block 135 in approximately 67 feet of water, as well as Transco's 8" pipeline in Eugene Island Block 133 in approximately 61 feet of water. Transco's 20' pipeline, however, did not actually rupture until March of 2006, six months after the impact by the MARIANAS. Transco alleges the rupture was a result of the initial impact by the MARIANAS, as evidenced by the drag scars, the metallurgical studies and other fact and expert evidence to be introduced at trial. The rupture of Transco's 20" line caused not only the 20" line to flood with debris and seawater but also caused another Transco pipeline – a connected 16" line – to flood with debris and seawater, events that would not have happened had Transco been given the opportunity to find and repair the damaged 20" pipeline in a controlled environment.

Unfortunately, because Transco had no reason to know or suspect that its 20" pipeline had been damaged by the drifting MARIANAS, Transco continued its normal operations with its 20" pipeline following Hurricane Rita. It was not until Transco's 20" pipeline ruptured in March of 2006 that Transco was made aware of the damage to its 20" pipeline from the MARIANAS. In connection with its investigation of the 20" rupture, Transco's surveyor found the very apparent MARIANAS' drag scars and tracked the drag scars to find the damage to Transco's 8" pipeline. Though not the subject of the instant Motion, overwhelming evidence will be presented

to support Transco's burden of proving that the MARIANAS struck Transco's pipelines while adrift during Hurricane Rita. As will be fully established at the trial of this matter, the MARIANAS drifted in a northwesterly direction until it contacted the seabed in approximately 70 feet of water and began leaving a unique, 12 mile drag scar that precisely matches the features of the MARIANAS and which comes to an end at the exact location that the MARIANAS was found grounded in 65 feet of water. Transco's ruptured pipelines were directly in the path of the subject drag scar and, Transco submits that had Transocean investigated its own drag scar, it would have minimized Transco's ultimate damages. While the issues of causation and damages are not the subject of this Motion and will be issues for trial, a more detailed discussion of these facts as they related to causation are presented in EOG's Memorandum in Opposition to Transocean's Motion for Summary Judgment [Docket #147]. The damage to Transco's three pipelines resulted in substantial repair costs, loss of revenue, overhead, and other expenses totaling $21,360,538.

## SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[11] The party moving for summary judgment bears the initial responsibility of informing the district court of the basis of the motion, and identifying those portions of the record that it believes demonstrate the absence

---

[11] FED. R. CIV. P. 56(c).

of a genuine issue of material fact.[12] Further, "the moving party need not produce evidence negating the existence of a material fact, but need only point out the absence of evidence supporting the nonmoving party's case."[13] When the moving party has carried its burden under Rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."[14] The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings.[15] Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."[16] Finally, substantive law determines materiality of facts and only "facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[17] Hence, pursuant to this standard, partial summary judgment is appropriate in the instant case.

## LAW AND ARGUMENT

In filing the instant lawsuit, Transco states several theories of recovery against Transocean. One theory is that Transocean did not exercise reasonable care consistent with that of a prudent MODU owner and operator in operating, maintaining and securing the MARIANAS prior to Hurricane Rita, which theory is not subject of the instant motion for partial summary judgment. Another entirely separate theory of recovery, however, is that Transocean also failed to exercise reasonable care consistent with that of a prudent MODU owner and operator *after* the

---

[12] *Stults v. Conoco*, 76 F.3d 651 (5th Cir. 1996) (citing *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 912-13 (5th Cir. 1992)).
[13] *Latimer v. Smithkline & French Laboratories*, 919 F.2d 301, 303 (5th Cir. 1990).
[14] *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also, Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir.1995).
[15] FED. R. CIV. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).
[16] *Matsushita Elec. Industrial Co.*, 475 U.S. at 588.
[17] *Anderson*, 477 U.S. at 248.

MARIANAS broke free from her moorings and drifted unmanned with a 70 foot draft for 130 miles through the Gulf of Mexico and was ultimately found hard aground in 60 feet of water. Specifically, Transocean failed to comply with applicable U.S. Coast Guard regulations regarding notice and investigation following a marine casualty of this nature, failed to conduct *any* investigation regarding potential damage to third parties with pipelines in the area (notwithstanding the obvious likelihood of such and the availability of such information in the public record), and failed to identify and/or notify potentially damaged third parties. Transco submits that Transocean was in the best position to investigate whether the MARIANAS had damaged any third party pipelines in the area as it knew the draft of the MARIANAS had at least exceeded the depth of water in a certain defined area around where it was recovered and the existence of and locations of pipelines in that area, as well as the identity of the owners of such pipelines, are all a matter of public record.[18]

Transco's claims against Transocean arise under general maritime tort law. "The analysis of a maritime tort is guided by general principles of negligence law."[19] To establish a negligence claim under general maritime law, the plaintiff must show that the defendant owed the plaintiff a duty of care; that defendant breached that duty; that plaintiff sustained an injury; and that defendant's conduct caused plaintiff's injuries.[20] In an effort to narrow the issues for trial of this case, Transco files the instant motion asking this Court to issue an Order declaring Transocean

---

[18] While causation is not subject of the instant motion, Transco submits that had Transocean acted as a reasonable owner of a MODU that broke free and drifted for 130 miles in the Gulf of Mexico and grounded in shallow water by investigating the path of the drag scar *and/or* had it complied with the applicable U.S. Coast Guard regulations, the overwhelming evidence at trial will establish that more likely than not the damage to Transco's 20" pipeline would have been discovered and repaired before it ruptured, flooding both the 20" and the 16" pipeline with seawater, thereby greatly decreasing the ultimate damages in this case.
[19] *In re Signal Intern., LLC*, 579 F.3d 478, 491 (5th Cir.2009) (internal quotation and citation omitted).
[20] *See In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir.1991).

negligent *per se* for failing to comply with applicable U.S. Coast Guard regulations as a matter of law and/or alternatively negligent for failing to act as a reasonably prudent MODU owner by not conducting any investigation to identify and notify potentially damaged third party pipeline owners like Transco. Thus, the instant Motion for Partial Summary Judgment deals with the issues of duty and breach thereof (i.e. negligence) and not causation and damages.

### A. TRANSOCEAN'S VIOLATION OF APPLICABLE U.S. COAST GUARD STATUTES CONSTITUTES NEGLIGENCE *PER SE*

In the U.S. Fifth Circuit, the law is well established that federal regulations governing maritime conduct establish the applicable standard of care if the plaintiff belongs to the class of persons the regulation is designed to protect and the statute intends to protect against the risk of harm that occurred and the violation of such regulations is negligence in itself or negligence *per se*.[21] In *Marshall v. Isthmian Lines, Inc.*, which dealt with the alleged violation of regulations issued by the U.S. Coast Guard and the legal principle of negligence *per se*, the court stated:

> Inherent in this statement of the legal principle are three questions which must be resolved before liability could be imposed ... on a negligence *per se* theory. What proof makes out a violation of the regulations? Were the regulations designed to protect [the plaintiff]? Were they intended to protect against the risk of the kind of harm that occurred here ...?[22]

The U.S. Coast Guard is authorized to "administer laws and promulgate and enforce regulations for the promotion of safety of life and property on and under the high seas and waters subject to the jurisdiction of the United States covering all matters not specifically delegated by

---

[21] *See Pennzoil Producing Co., et al. v. Offshore Express, Inc.*, 943 F.2d 1465, 1471-72 (5th Cir.1991) (*citing The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136 (1874)); *Marshall v. Isthmian Lines, Inc.*, 334 F.2d 131, 134 (5th Cir.1964)) (holding that applicable U.S. Coast Guard regulations supplied the standard of care); Prosser, Torts § 34, at 161 (2d ed. 1955); Restatement, Torts § 286 (1934).
[22] 334 F.2d at 134.

law to some other executive department."[23] Accordingly, the U.S. Coast Guard has promulgated regulations governing the reporting and investigation of marine casualties at 46 C.F.R. § 4.01-1 to 46 C.F.R. § 4.40-35. These regulations specifically include grounding, allision and "[f]ailures or occurrences, regardless of cause, which impair any aspect of a vessel's operation" within the definition of "marine casualty."[24] The U.S. Coast Guard further defines a "serious marine accident" as an accident involving damage to property in excess of $100,000, which includes the cost of labor and material to restore the property to its condition before the occurrence.[25] These regulations also govern reports of potential vessel casualty, stating that a vessel owner "shall **immediately** notify" the U.S. Coast Guard "if there is reason to believe a vessel is lost or imperiled" and "whenever a vessel is involved in a marine casualty consisting in—(1) An unintended grounding ...or...(7) An occurrence causing property damage in excess of $25,000."[26] The regulations specifically provide that Mobile Offshore Drilling Units (MODUS) like the MARIANAS are vessels and their owners are required to report an accident that results in, for example, an accidental grounding or property damage in excess of $25,000.[27]

The regulations also state that such a vessel/MODU owner "within give days" *shall* file a written report of any marine casualty, including an unintended grounding, on Form CG-2692, Report of Marine Accident, Injury or Death, **in addition to** the required "immediate notice" to the U.S. Coast Guard.[28] Notably, the U.S. Coast Guard's Form CG-2692, Report of Marine Accident, Injury or Death is accompanied by Instructions for its completion, which include a

---

[23] 14 U.S.C. § 2.
[24] 46 C.F.R. § 4.03-1 (i), (v), (vi) and (x).
[25] 46 C.F.R. § 4.03-2(a)(3).
[26] 46 C.F.R. § 4.04-1 and 4.05-1(a)(1)-(7) (emphasis added).
[27] 46 C.F.R. § 4.05-1 and 46 C.F.R. § 109.411.
[28] 46 C.F.R. § 4.05-10.

"Notice" stating that the "information collected on this form is routinely available for public inspection" and that the form "is needed by the Coast Guard to carry out its responsibility to investigate marine casualties, to identify hazardous conditions or situations."[29] The Coast Guard estimates that the "average burden" for submitting the required Form CG-2692 is merely one hour.[30]

Lastly, the U.S. Coast Guard regulations address the responsibilities of the "marine employer", stating that "[a]t the time of a marine casualty ... the marine employer shall make a timely, good faith determination as to whether the occurrence concurrently is, or is likely to become, a serious marine incident." [31] Transocean is included within the regulations' definition of a "marine employer," as the definition includes the owner in charge of a veseel other than a recreational vessel.[32] Transco submits that the foregoing U.S. Coast Guard regulations clearly establish the standard of care that Transocean should have followed as the owner of a MODU that became adrift and ultimately grounded, causing damage obviously in excess of both $25,000 and $100,000.

It is undisputed that despite the mandate of the foregoing U.S. Coast Guard regulations, Transocean (1) did not notify the U.S. Coast Guard that the MARIANAS broke free from her moorings during Hurricane Rita and was therefore lost or imperiled, (2) did not notify the U.S. Coast Guard that the MARIANAS was discovered grounded in Eugene Island Block 113A on September 25, 2005, (3) did not complete and file the requisite Form CG-2692, Report of Marine Accident, Injury or Death and (4) did not make a timely, good faith determination as to whether

---

[29] See Form CG-2692, Report of Marine Accident, Injury or Death and Instructions, attached hereto as Exhibit "F."
[30] See *Id.*
[31] 46 C.F.R. § 4.06-1.
[32] 46 C.F.R. § 4.03-45.

the drifting and grounding of the MODCU TRANSOCEAN MARIANAS was actually or was likely to become a "serious marine incident.".[33] Transcoean's violation of these governing regulations and breach of its statutory duty thereby deprived the U.S. Coast Guard of the opportunity to investigate this marine casualty, identify potentially hazardous conditions and/or otherwise prevent further damage. Transocean's violation of these governing regulations and breach of its statutory duty also resulted in the fact of the MARIANAS' drifting and grounding being excluded from the publicly-available U.S. Coast Guard records, where Transco would have another opportunity to be on notice of potential damage to its pipelines. Thus, Transco submits that the class of intended beneficiaries of the foregoing U.S. Coast Guard regulations would include any and all entities that could have been damaged by the drifting and grounding of the MARIANAS, who would have been identified and notified by the U.S. Coast Guard in connection with its stated purpose of carrying out its responsibility of investigating marine casualties and identifying hazardous conditions. Clearly the possible damage to and/or rupture of oil and gas transmission pipelines on the seabed of the Gulf of Mexico that could have been struck by the dragging MARIANAS would constitute a potentially hazardous condition that the U.S. Coast Guard would attempt to identify and prevent if possible. Thus, Transco, as a pipeline owner in the immediate area of the grounded MARIANAS, a fact discoverable as a matter of public record from any number of sources, including the Minerals Management Service records, was within the class of intended beneficiaries of the foregoing U.S. Coast Guard regulations.

---

[33] See Transco's Request for Production No. 19 and Interrogatory No. 23 and Transocean's responses to same, all attached hereto as Exhibit "B"; Transco's Interrogatory No. 21 and Transocean's response to same, attached hereto as Exhibit "C"; Deposition of Kenneth Brown dated 2/25/2010, pp. 77-78, 87-92, attached hereto as Exhibit "A"; FOIA request by Transco on 10/3/2007 to the U.S. Coast Guard, attached hereto as Exhibit "D"; and U.S. Coast Guard FOIA response to Transco dated 11/5/2007, attached hereto as Exhibit "E."

Further, it is plain that these specific U.S. Coast Guard regulations and the whole statutory-regulatory structure are aimed directly at avoiding injuries, including property damage, from hazardous conditions such as unintentionally grounded vessels or vessels otherwise "lost or imperiled." Thus, Transco submits that on accepted principles of maritime negligence, Transocean's admitted violation of the applicable U.S. Coast Guard safety regulations constitutes negligence *per se* and Transco asks this Court to enter an Order finding same.

### B. ALTERNATIVELY, TRANSOCEAN'S FAILURE TO CONDUCT ANY INVESTIGATION AND/OR NOTIFY POTENTIALLY DAMAGED THIRD PARTIES SUCH AS TRANSCO CONSTITUTES NEGLIGENCE AS A MATTER OF LAW.

General maritime tort law governs the question of whether Transcoean owed and breached a duty to Transco to track the drag scar of the MARIANAS and/or otherwise identify Transco's pipelines as potentially damaged by the runaway MARIANAS and notify Transco of such possibility.[34] The determination of whether a party owes a duty to another in a maritime tort case depends on a variety of factors, "most notably the foreseeability of the harm suffered by the complaining party."[35] "Duty ... is measured by the scope of the risk that negligent conduct foreseeably entails."[36] The U.S. Fifth Circuit explains foreseeability:

> We perceive a harm to be the foreseeable consequence of an act or omission if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention.[37]

In other words, negligence is the doing of some act that a reasonably prudent person would not do, or the failure to do something that a reasonably prudent person would do, under the same or

---

[34] *See In re Signal Intern., LLC*, 579 F.3d 478, 491 (5th Cir.2009); *Florida Fuels, Inc. v. Citgo Petroleum Corp.*, 6 F.3d 330, 333 (5th Cir.1993).
[35] *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir.1987).
[36] *Id.*
[37] *Id.* at 68.

13

similar circumstances—failure to use ordinary care under the circumstances.[38] The question of whether Transocean owes a duty to Transco in the instant circumstances is a question of law.[39] Whether a particular duty was breached generally is regarded as a mixed question of law and fact, but only to the extent that reasonable minds could, differ.[40]

Thus, the critical question in this case is whether it would be foreseeable to a reasonably thoughtful MODU owner with a vessel that drifted unmanned 130 miles in the Gulf of Mexico and grounded in water more shallow than its draft that there could be latent damage to pipelines in the area that would not be readily apparent to the pipeline owner, but could be easily and readily discovered had Transocean conducted *any* investigation to determine whether any pipelines or other property lay within the drag scar path of the MARIANAS. With the instant motion, Transco submits that the undisputed facts establish as a matter of law that Transocean owed Transco a duty to investigate the potential for damage to Transco's pipelines and Transocean breached that duty in admittedly failing to investigate the grounding.[41] Transocean at all relevant times knew or could have easily obtained information regarding (1) the draft of its own vessel, now known to be approximately 70 feet, (2) the depth of the surrounding waters near its grounded location and within its drag scars, (Transco's pipelines were in 67 and 61 feet of water), and (3) the location of the subsea pipelines in the area near the grounded location of the MARIANAS and leading towards the location from with the vessel drifted. Instead of investigating those easily identifiable facts and any potential damage the MARIANAS may have

---

[38] *See, e.g., Mitchell v. The Trawler Racer, Incorporated,* 362 U.S. 539 (1960); *Benton v. Diamond Services, Inc.,* 16 F.3d 1215, 1994 WL 57352 (5th Cir. 1994).
[39] *See Canal Barge Co. v. Torco Oil Co.,* 220 F.3d 370, 376 (5th Cir.2000); *Consolidated Aluminum Corp.,* 833 F.2d at 67 ("Determination of the tortfeasor's duty, and its parameters, is a function of the court.").
[40] See Maraist & Galligan, LOUISIANA TORT LAW § 3.03 (2nd Ed. 2005).
[41] Again, Transco submits that the issue of causation is not before the Court with the instant Motion.

caused (or notifying the U.S. Coast Guard of the loss of contact with the vessel and the ultimate grounding incident so that the U.S. Coast Guard could undertake such an investigation), Transocean chose to simply pull the vessel to shore for repairs as quickly as possible and ignore the high likelihood that the MARIANAS had damaged subsea structures. Amazingly, Transocean actually hired a sub-sea surveying company, Fugro Chance, to assist it in removing the MARIANAS from its grounded location, asking Fugro Chance to ensure that the MARIANAS and the rescue vessels did not hit any pipelines while being dragged to a shipyard in Texas.[42] This fact alone evidences an awareness by Transocean that it was highly likely that the MARIANAS may hit something while drifting and grounding in water depths shallower than its 70 foot draft. At no time, however, did Transcocean ask Fugro Chance or any other surveyor to track the drag scar of the MARIANAS through side scan sonar, Mesotech sonar or other available means to determine whether the MARIANAS had crossed and/or potentially struck any pipelines or other structures, even though such is within the expertise of Fugro Chance and Fugro Chance actually did subsequently investigate the MARIANAS' drag scar at the request of Chevron, who was concerned with potential damage to one of its own pipelines.[43] Notably, in connection with the Chevron job, Fugro Chance determined that the MARIANAS caused the drag scars found in their investigation.[44] In short, as a matter of law Transocean did not act as a reasonably prudent MODU owner should have acted after discovering its vessel grounded in shallow waters with known pipelines in the vicinity and in its drift path, especially when the existence and location of pipelines in the area of the MODU's grounding and the identity of the

---

[42] *See* Deposition of Tony Parker of Fugro Chance dated 3/8/2010, pp.6-8, attached hereto as Exhibit "G."
[43] *See Id.* at pp.56, 59-60, 67-69.
[44] *See, Id.* at p. 69.

pipeline owners are readily available in the public records and it had a surveyor in its employ to make sure the MARIANAS did not contact any pipelines while she was headed ashore for repairs. Though not subject of the instant motion, Transco submits that had Transocean acted prudently, it will be proven at trial that the resulting damage that occurred when Transco's 20" pipeline eventually ruptured six months after the allision more likely than not would have been discovered and prevented. For all of these reasons, Transco seeks an Order from this Court finding Transocean negligent as a matter of law.

## CONCLUSION

Therefore, for the foregoing reasons, plaintiff, Transcontinental Gas Pipe Line Corporation respectfully requests that this Court grant its Motion for Partial Summary Judgment Finding Transocean Negligent for Failing to Notify and/or Investigate and issue an Order finding defendant, Transocean Deepwater Drilling, Inc. either negligent *per se* for failing to comply with applicable U.S. Coast Guard regulations and/or alternatively negligent as a matter of law for failing to act as a reasonably prudent MODU owner after discovering its vessel grounded in shallow waters with known pipelines in the vicinity and in its drift path.

Respectfully submitted,

KEAN, MILLER, HAWTHORNE,
D'ARMOND, MCCOWAN & JARMAN, L.L.P.

_____
MICHAEL A. McGLONE, T.A. (#9318)
LAWRENCE J. HAND, JR. (#23770)
KAREN WATERS SHIPMAN (#27320)
BRETT P. FENASCI (#29858)
909 Poydras Street, Suite 1450
New Orleans, LA 70112
Telephone: (504) 585-3050
Fax: (504) 585-3051
**Attorneys for Plaintiff, Transcontinental Gas Pipe Line Corporation**

## CERTIFICATE OF SERVICE

I Hereby Certify that on the 27th day of April, 2010, I electronically filed the foregoing with the Clerk of Court by using CM/ECF system which will send a notice of electronic filing to all counsel of record.

_____